# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

SHERRY J. PAYNE,          :
                             :
           **Plaintiff**      :     **CIVIL ACTION NO. 4:11-CV-01113**
                             :
        **vs.**              :     **(Complaint Filed 6/09/11)**
                             :
MICHAEL J. ASTRUE,        :
COMMISSIONER OF SOCIAL   :         **(Judge Caputo)**
SECURITY,                 :
                             :
        **Defendant**     :

## MEMORANDUM

## BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Sherry J. Payne's claim for social security disability insurance benefits.

On May 7, 2008, Payne filed protectively[1] an application for disability insurance benefits. Tr. 11, 77, 102 and 154.[2] The application was initially denied by the Bureau of Disability Determination[3] on August 27, 2008. Tr. 79-82. On October 29, 2008, Payne requested a hearing before an administrative law judge. Tr. 83. After about 17 months had

---

[1] Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

[2] References to "Tr._" are to pages of the administrative record filed by the Defendant as part of his Answer on August 24, 2011.

[3] The Bureau of Disability Determination is a state agency which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 79.

passed, a hearing was held on March 23, 2010. Tr. 23-57. On April 15, 2010, the administrative law judge issued a decision denying Payne's application. Tr. 11-19. On June 15, 2010, Payne filed a request for review with the Appeals Council and on April 8, 2011, the Appeals Council concluded that there was no basis upon which to grant Payne's request. Tr. 1-5. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Payne then filed a complaint in this court on June 9, 2011. Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on December 16, 2011, when Payne elected not to file a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Payne meets the insured status requirements of the Social Security Act through December 31, 2013. Tr. 11, 13 and 102.

Payne, who was born in the United States on April 6, 1967,[5] graduated from high school and can read, write, speak and understand the English language and perform

---

[4]Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

[5]At the time of the administrative hearing and the administrative law judge's decision, Payne was 42 and 43 years of age, respectively, and considered a "younger individual" whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. § 404.1563(c). The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

basic mathematical functions. Tr. 29, 50-51, 111 and 119. During Payne's elementary and secondary schooling, she attended regular education classes. Tr. 119. After obtaining, a high school diploma, Payne in 2004 completed 3 years of college. Id. Payne also had secretarial training, book keeping training, interior, kitchen and bath design training, residential space planning training, bridal consultant training, and art training. Id.

Payne has past relevant employment[6] as an owner of a cleaning business, a banking loan officer, and an interior designer of kitchens and bathrooms. Tr. 50-51, 113 and 121. Those positions were described by a vocational expert as skilled, sedentary to medium work. Tr. 50-51. [7]

---

[6]Past relevant employment in the present case means work performed by Payne during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

[7]The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

(a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

Payne's work and earnings history spans the years 1984 through 2008. Tr. 103, 108 and 121.  Records of the Social Security Administration reveal that Payne had earnings as follows:

| | |
|---|---|
| 1984 | $  633.17 |
| 1985 | 2837.51 |
| 1986 | 3509.10 |
| 1987 | 600.25 |
| 1988 | 6507.51 |
| 1989 | 5670.67 |
| 1990 | 2390.44 |
| 1991 | 2285.26 |
| 1992 | 0.00 |
| 1993 | 7147.00 |
| 1994 | 1763.00 |

------

If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as  loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

(e) *Very heavy work*.  Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

20 C.F.R. § 404.1567.

| | |
|---|---|
| 1995 | 11484.57 |
| 1996 | 4275.02 |
| 1997 | 3484.00 |
| 1998 | 5162.00 |
| 1999 | 9347.00 |
| 2000 | 12049.00 |
| 2001 | 8000.00 |
| 2002 | 5167.00 |
| 2003 | 16278.28 |
| 2004 | 21359.19 |
| 2005 | 19922.71 |
| 2006 | 34260.22 |
| 2007 | 11421.83 |
| 2008 | 7578.00 |

Tr. 103.  Payne's total earnings from 1984 through 2008 were $203,132.73. Id.

Payne alleges that she became disabled on February 5, 2007, because of disorders of the  back and spine.  Tr. 112.  In a document filed with the Social Security Administration, Payne stated that she is limited in her  "ability to walk, sit, bend and lift anything for any prolonged period of time" and that she has "inflamation in the lower back." Id.   Payne contends she has medication side-effects which prevent her from driving and "function[ing] properly." Id.   Payne claims that she cannot "stand for more than an hour or so," bend to the floor or lift and carry more than 10 pounds.  Id.   She further contends that she has fatigue in the morning and memory problems.  Id.

In a document filed with the Social Security Administration in conjunction with Payne's application for benefits, Payne indicated that she stopped working on February 3, 2007, "[b]ecause of [her] condition and other reasons severe sciatic nerve pain, leg cramping, numbness from back to toes. (sic) Severe low back pain and cramping. (sic) I had to take medications which do not allow me to function on a normal level.  There are many things that I could not perform at work.  Lifting, bending, going to job sites for new

construction to measure kitchen and bath space requires bending and kneeling to measure. I would walk unstable and falling was a risk. " Id.

Although Payne claims that she has been disabled and unable to work since February 5, 2007, the record reveals that Payne applied for and received unemployment compensation benefits during the 4th quarter of 2007($3681.00) and the 1st ($4908.00) and 2nd quarter ($2045.00) of 2008. Tr. 104.  At the administrative hearing, Payne testified that she commenced receiving unemployment compensation benefits in July of 2008 and that she was still receiving unemployment compensation benefits. Tr. 30.

The administrative law judge questioned Payne regarding her application for unemployment compensation benefits and receiving the same well after her alleged disability onset date of February 5, 2007.  Tr. 30.  That exchange in relevant part was as follows:

> Q. Now do you realize that by receiving Unemployment Compensation you're certifying that you're ready, willing, and able to work?
>
> A. Yes, I was trying to find a job and trying to find something that I could functionally do along the way and ---

Id.   Payne further stated: ""I was trying to find employment and trying to find a job that I could try and do. Not that I could functionally do it, you know, hoping that I could be able to functionally do it.  There's just nothing that I think I am able to do." Id.  When asked whether she was still looking for work, Payne answered in the affirmative but stated that her "injury has been getting worse." Tr. 31. [8]

_____

[8]An individual can only collect unemployment compensation if the individual is able and willing to accept work. 43 P.S. §801(d)(1).  A person who receives unemployment compensation, has to engage in a job search and report regularly to the Unemployment Compensation office regarding his or her efforts.  Payne did not indicate that when she engaged in the job search she was only applying for part-time work.

For the reasons set forth below we will affirm the decision of the Commissioner denying Payne disability insurance benefits.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin.,  181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence.");  Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001);  Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360

(3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason</u>, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

[a]n individual shall be determined to be under a

8

> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work. For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant
> numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance claims. See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[9] (2) has an impairment that is severe or a combination of impairments that is severe,[10] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[11] (4) has the residual functional capacity to return to his

---

[9]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

[10] The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

[11]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an

or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[12]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## MEDICAL RECORDS AND OTHER EVIDENCE

The medical records reveal that Payne was treated primarily for physical problems. Payne did receive medications for depression. However, there is no indication that she received any counseling or other therapy and no treating physician has opined that she has mental work-related functional impairments.

_____

impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

[12]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

It appears that the impetus for Payne's back disorders and pain was an incident in April, 2006, when she fell down some steps. Tr. 180. On April 6, 2006, Payne received treatment at the emergency department of the Pocono Medical Center for that fall. Tr. 178-186. The emergency department nursing assessment reveals that Payne was able to ambulate normally and Payne denied paresthesias,[13] CVA tenderness[14] and extremity weakness. Tr. 180. Payne also had strong pulses in the upper and lower extremities, she denied neck pain and she had full range of motion of the neck and her neck was non-tender. Id. It was further noted that Payne was oriented to person, place and time and had a normal affect. Tr. 182. A physical examination revealed essentially normal findings. Id. The final diagnosis was that Payne suffered from an acute right lumbar contusion with radiculopathy.[15] Tr. 183. Payne was prescribed pain medications and discharged from the hospital the same day. Tr. 182.

On October 23, 2006, Payne again visited the emergency department at the Pocono Medical Center. Tr. 171-177. On this occasion Payne complained of bilateral hip

---

[13]Paresthesia is a sensation of tingling, prickling, or numbness of the skin, more generally known as the feeling of pins and needles. Dorland's Illustrated Medical Dictionary, 1371 (32nd Ed. 2012).

[14]"CVA tenderness" refers to tenderness at the costovertebral angle which is the acute angle formed between the twelfth rib and the vertebral column. Pain at this area is usually attributed to kidney disease.

[15]Lumbar radiculopathy or sciatica is defined as "a syndrome characterized by pain radiating from the back into the buttocks and along the posterior or lateral aspect of the lower limb; it is most often caused by protrusion of a low lumbar intervertebral disk. The term is also used to refer to pain anywhere along the course of the sciatic nerve." Dorland's Illustrated Medical Dictionary, 1678 (32nd Ed. 2012); see also Center for Pain Management, Lumbar Radiculopathy/Sciatica, http://www.indypain. com/chronic-pain-acute-pain-conditions/lumbar-radiculopathy-sciatica/ (Last accessed October 26, 2012).

and back pain. Tr. 171-172.  The results of a physical examination were essentially normal. Tr. 174.  Although Payne had bilateral paralumbar tenderness, she had a normal gait and normal motor and neurological function.  Id.  She was also oriented to person, place and time and had a normal affect.  Id.  The assessment was that Payne suffered from an acute lumbar strain. Tr. 175.  Payne was prescribed pain medications, instructed to apply ice to and massage the back, and discharged from the hospital on the same day. Tr. 174-175.

On October 26, 2006, Payne had an appointment with Slobodan Miric, M.D., of Northeast Neurology Center, East Stroudsburg , Pennsylvania. Tr. 226-228.   At that appointment Payne complained of pain in the lower back which radiated into her right leg. Tr. 226.   Payne denied that she suffered from depression, anxiety and insomnia. Tr. 227.  A mental status examination revealed that Payne was alert and oriented to person, place and time; Payne was fluent with normal comprehension, attention and judgment; Payne had an appropriate affect and her recent memory was intact; and Payne had no aphasia[16] or dysarthria.[17] Id.   The results of Dr. Miric's examination of Payne was essentially normal except for the following: Payne in the lower extremity had "significant pain secondary to testing" and some muscles of the lower extremity appeared to be weaker; Payne had tenderness in the sacral area and paraspinal tenderness on the right and some mild spasm;

---

[16]"Aphasia" is defined as "[a]ny of a large group of speech disorders involving defect or loss of the power of expression by speech, writing or signs, or of comprehending spoken or written language, due to injury or disease of the brain or to psychogenic causes." Dorland's Illustrated Medical Dictionary, 114 (32nd  Ed. 2012).

[17]"Dysarthria" is defined as "a speech disorder consisting of imperfect articulation due to loss of muscular control after damage to the central or peripheral nervous system." Dorland's Illustrated Medical Dictionary, 572 (32nd  Ed. 2012).

and Payne had a positive straight leg raise[18] and an antalgic gait on the right.[19] Id. Dr. Miric's impression was that Payne suffered from an L5-S1 radiculopathy. Tr. 228. Dr. Miric prescribed pain medications and ordered an MRI of the lumbar spine and sacrum and electrodiagnostic testing of the lower extremities. Id.

An MRI of the lumbar spine performed on November 1, 2006, revealed the following: lumbar degenerative changes with disc desiccation;[20] mild disk bulge at the level of L4-5; a central disk herniation at the level of L5-S1 with impingement of the thecal sac[21] and possible compression of the bilateral S1 nerve roots; no spinal canal stenosis;[22] no

_____

[18]The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc. The patient, either lying or sitting with the knee straight, has his or her leg lifted. The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed October 26, 2012).

[19]Antalgic is defined as "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." Dorland's Illustrated Medical Dictionary, 97 (32nd Ed. 2012).

[20]Disc desiccation refers to the loss of water content of the intervertebral discs.

[21]The thecal sac is an elongated tube that extends from the brain to the end of the spine in which the spinal cord and nerve roots run. It is a covering (membrane) that surrounds the spinal cord and contains cerebral spinal fluid. Herniated discs which impinge the thecal sac may or may not cause pain symptoms.

[22]"Spinal stenosis is a narrowing of one or more areas in your spine – most often in your neck or lower back. This narrowing can put pressure on the spinal cord or spinal nerves at the level of compression. Depending on which nerves are affected, spinal stenosis can cause pain or numbness in your legs, back, neck, shoulders or arms; limb weakness and incoordination; loss of sensation in your extremities; and problems with bladder or bowel function. Pain is not always present, particularly if you have spinal stenosis in your neck." Spinal Stenosis, Definition, Mayo Clinic staff, Mayoclinic.com, http://www.mayoclinic.com/health/spinal-stenosis/DS00515 (Last accessed October 26, 2012).

narrowing of the neural foramina;[23] and no evidence of spinal cord compression. Tr. 187. An MRI of the sacrum performed on November 1, 2006 revealed a normal sacrum and no evidence of a destructive lesion. Tr. 188.  Electrodiagnostic testing performed on November 1, 2006, revealed an abnormal ENMG[24] of the right lower extremity consistent with S1 root irritation of an acute nature and a normal left lower extremity ENMG. Tr. 229.

A neurological examination of Payne by Dr. Miric on November 6, 2006, revealed that Payne was "alert and oriented [to person, place and time] and fluent with normal comprehension, attention, and judgment. Reflexes [were] brisk and symmetric in upper and lower extremities. Coordination [was] intact. There [was] no ataxia.[25]  Lumbar spine examination demonstrate[d] tenderness in the sacral area, mainly in the midline and also paraspinal tenderness on the right at L5-S1. Raise leg testing [was] positive.  Gait [was] less antalgic than prior appointment." Tr. 225.   Dr. Miric's impression was that Payne suffered from an L5-S1 radiculopathy secondary to a herniated disc. Id.  Dr. Miric referred Payne to a pain management specialist. Id.

On November 28 and December 7 and 15, 2006, Payne had appointments with Mikhail Artamonov, M.D., a pain management specialist at the Northeastern Rehabilitation Pain Management Center, in East Stroudsburg, Pennsylvania. Tr. 191-193. At the appointment on November 28th Payne received a fluoroscopic guided injection of

---

[23]The neural foramina are openings/channels formed by the vertebra along the spine through which the spinal roots/nerves exit the spinal column.

[24]"ENMG" is an abbreviation for electroneuromyography.

[25]Ataxic (or atactic) is defined as "lacking coordination; irregular; pertaining to or characterized by ataxia."  Ataxia is defined as "failure of muscular coordination; irregularity of muscular action." Id. at 170-171.

Lidocaine into the sacroiliac joint; on December 7th an injection of Lidocaine and Depomedrol into the foramen of the left S1 nerve root; and on December 15th an injection of Lidocaine and Depomedrol into the foramen of the right S1 nerve root. Id.

On January 4, 2007, one-month before Payne's alleged disability onset date, Payne had an appointment with Dr. Artamonov. Tr. 190. The purpose of this appointment was for Payne to undergo a "radiofrequency ablation of [the] S1 ganglion." Id. However, at the appointment Payne reported significant improvement in her pain level and only had some "minimal residual buttock pain" and "mild radiation to the lower extremity." Id. Payne was "overall very pleased with the results of [Dr. Artamonov's] intervention" and reported that her level of functioning had increased and that she was not taking any pain medications. Id. Dr. Artamonov canceled the radiofrequency ablation "in view of [Payne's]] nearly complete pain relief." Id.

Payne had an appointment with Dr. Miric on January 25, 2007, at which Payne reported that her pain had returned. Tr. 224. A neurological examination revealed the following: "She is alert, oriented, and fluent. Reflexes are symmetric without ataxia. There is tenderness at the L5-S1 area. Raise leg test is positive. Gait is not antalgic like before." Id. Dr. Miric prescribed pain medications and scheduled a follow-up appointment in 6 weeks. Id. The report of this appointment further states that Payne was "now planned for radiofrequency ablation in 2 months depends on how she feels." Id.

Payne returned to Dr. Artamonov on March 12, 2007, and reported that she was "still doing significantly better as far as the pain down [her] leg and lower back." Tr. 189. Payne complained of numbness on her left side, and reported that he had been referred to a neurosurgeon. Id. Dr. Artamonov noted that overall Payne was doing better and had

15

increased functioning. Id.  Dr. Artamonov recommended hamstring stretches and that she return in two months. Id.  Dr. Artamonov further stated that prior to any surgical intervention, Payne would be a candidate for radiofrequency ablation of the bilateral dorsal root ganglion. Id.

On April 24, 2007, Payne attended a neurological consultation with Gregory E. Thompson, M.D. Tr. 215-217.  At that appointment, Payne complained of pain and cramping in her left leg and in contrast to her prior reports to Dr. Artamonov stated that her previous injections did not alleviate "any" of her symptoms. Tr. 215.  Payne reported that massage therapy helped and allowed her to "cut back on her medications." Id.  Payne admitted that she was "relatively pain free." Id.  The results of a physical examination were essentially normal. Tr. 216.  Payne had "normal curves of her cervical, thoracic and lumbar spine," she had "no bony or soft-tissue areas of tenderness to palpation," the range of motion of her back was "good along all planes," she walked "with a normal gait, without any evidence of weakness or myelopathy," she had normal muscle strength "in all muscle groups, with the exception of dorsiflexion of her left foot,[26] which [was] just slightly weaker,"

---

[26]"Dorsiflexion" is defined as "flexion or bending toward the extensor aspect of a limb[.]"  Dorland's Illustrated Medical Dictionary, 560 (32nd Ed. 2012). In the dorsiflexion of the foot, the front part of the foot is bent towards the shin bone.

she was "able to heel/toe-walk,[27] tandem walk[28] and do plantar lifts [going forward on the sole of the foot while lifting the heel]  and quad dips [squatting]," her reflexes were normal and "symmetrical, but absent at the left ankle," and "[h]er sensory exam was somewhat diminished over the lateral left calf to pinprick sensation." Id.  It was reported that Payne had "a positive left straight leg raise test with pain radiating posteriorly to her knee."  Id.   Dr. Thompson requested that Payne obtain a new MRI of the lumbar spine and advised her to continue with massage therapy and "even some gentle manipulation by [a] chiropractor[.]".  Id.

A May 2, 2007, MRI of the lumbar spine revealed that "[c]ompared with the previous study of 11/01/05, there is a slight worsening of disk herniation at the left paracentral area at the level of L5-S1 with slightly more compression of the left S1 nerve root." Tr. 218.  When Payne returned to Dr. Thompson on June 20, 2007, Dr. Thompson recommended that Payne consider undergoing a lumbar microdiscetomy to address her complaints of pain.  Tr. 213- 214.  Payne advised Dr. Thompson that she wanted to discuss the matter with her husband and family. Id.   Payne did not return to Dr. Thompson after that appointment.

On June 14, 2007, Payne underwent at the request of Dr. Miric an extensive

---

[27]The heel walk test requires the patient to walk on his heels. The inability to do so suggests L4-5 nerve root irritation. Clinical Examination Terminology, MLS Group of Companies, Inc., https://www.mls-ime.com/articles/GeneralTopics/ Clinical%20Examination%20Terminology.html (Last accessed October 29, 2012). The toe walk test requires the patient to walk on his toes. The inability to do so suggests L5-S1 nerve root irritation. Id.

[28]A tandem walk or gait is a method of walking where the toes of the back foot touch the heel of the front foot at each step.

17

functional capacity evaluation by Louise Kreider, a license occupational therapist. Tr. 194-209.  Based on Ms. Kreider's examination and testing of Payne, Ms. Kreider opined that Payne could perform light to medium work. Tr. 208.    Notably prior to the examination and testing, Payne told Ms. Kreider that during a typical day she would stand/walk 4 hrs, sit 6 hours and sleep or recline 14 hours. Tr. 195.  Payne also reported that she "can drive or ride in a car 2-3 hours before needing a rest." Id.  Ms. Kreider's testing of Payne revealed that Payne could frequently (up to two-thirds of an 8-hour workday) sit, stand and walk and frequently  leg lift 15 pounds, power lift 18 lbs, shoulder lift 13 pounds and overhead lift 8 pounds. Tr. 208.

On June 25, 2007, Dr. Miric, Payne's treating physician, completed a document entitled "Long Term Disability Claim Physician's Statement" in which he stated that Payne could sit and walk  for 2 to 5 hours (for each activity) during an 8-hour workday, stand for 4 to 5 hours, and that she could lift and carry 10 pounds. Tr. 220.

A neurological examination of Payne by Dr. Miric on July 5, 2007, revealed the following: "The patient is alert, oriented, and fluent. Cranial nerves are intact. Motor examination reveals full strength. She has tenderness and spasm at L5-S1 level with increased tone in the paravertebral musculature, active trigger points, and reflexes are symmetric and brisk." Tr. 333.

On July 25, 2007, Chester L. Smith, Jr., one of Payne's treating physicians at the Monroe County Women's Health Center, East Stroudsburg, completed a document entitled "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities." Tr. 261-262.  In that document Dr. Smith stated that Payne had no limitations with respect to lifting, carrying, standing, walking, sitting, pushing and pulling. Tr. 261.  Dr. Smith

further stated that Payne had no postural or environmental limitations and no limitations with respect to reaching, handling, fingering, seeing, hearing, speaking, tasting/smelling and continence. Tr. 262.

On August 7, 2008, Payne was examined by Joyce Vrabec, D.O., on behalf of the Bureau of Disability Determination. Tr. 271-278.   A physical examination of Payne by Dr. Vrabec revealed that Payne had a "completely normal ability to ambulate as well as to get in and out of the examination table and up and out of chairs." Tr. 272.  An examination of Payne's back revealed Payne's spine had a normal curvature, completely normal range of motion, a negative straight leg raising test bilaterally, and Payne was able to touch her toes and come back up without complaints of pain. Tr. 273.   Dr. Vrabec observed that Payne's extremities all had a normal appearance and Payne had normal muscle strength. Id.   Payne did have "some mild bilateral lumbar spasm and bogginess with some trigger points palpable." Id.   Dr. Vrabec completed a range of motion chart which indicates that Payne's range of motion of her shoulders, elbows, wrists, hands, cervical spine and lumbar spine were normal. Tr. 275-277.  Dr. Vrabec also completed a statement of Payne's ability to perform work-related physical activities. Tr. 279-278.  Dr. Vrabec found that Payne could occasionally lift and carry  up to 25 pounds, stand and walk up to 2 hours in an 8-hour workday and sit less than 6 hours (without specifying how much less) in an 8-hour workday. Tr. 279.

On August 18, 2008, Sharon A. Wander, M.D., reviewed Payne's medical records on behalf of the Bureau of Disability Determination and concluded that Payne had the ability to engage in the full-range of medium work. Tr. 285-291.

Payne primarily treated with Martha Boulos, M.D., at the Northeast Neurology

Center from October 31, 2008, through September, 2009. Tr. 320-333. Dr. Boulos consistently found full motor strength, normal reflexes, steady gait, intact movements, good tone, negative straight leg raising tests and no muscle spasm. (Tr. 322, 323, 327, 329 and 331. On September 24, 2009, Payne was examined by Fuhai Li, M.D., who found that Payne had normal muscle strength, reflexes and gait. Tr. 320.

On December 3, 2008, and April 6, 2009, Payne underwent MRIs of the lumbar spine. Tr. 317 and 319. The report of the MRI dated December 3, 2008, states in relevant part as follows: "When compared to the prior study, there is mild worsening of the degenerative changes with developing of L3-L4 mild disc bulge which was not seen on the prior study. Otherwise no significant change is appreciated." Tr. 317. The report of the MRI dated April 16, 2009, states in relevant part: "Compared with the previous study on 12/03/08, there is no significant interval change." Tr. 319. Also, it was reported by Dr. Boulos that Payne underwent an EMG and nerve conduction study of the lower extremities the results of which were unremarkable. Tr. 322.

On March 20, 2009, Payne underwent an MRI of the cervical spine. Tr. 318. This MRI did reveal disc herniations at the C4-C5 and C6-C7 levels, multi-level bilateral foramina narrowing and osteophytes (bone spurs). Id. However, there was no significant spinal stenosis. Id. In early 2009 Payne starting complaining of migraine headaches. Tr. 327. The record also reveals that Payne had a history of sinus problems. Tr. 297-303. At an appointment on May 8, 2009, Dr. Boulos found that Payne had "no significant [back] tenderness." Tr. 323. She further noted that Payne's cervical disc disease was stable. Id. On September 24, 2009, Payne told Dr. Li that her headaches had been stable. Tr. 320.

Neither Dr. Boulos nor Dr. Li at any point imposed on Payne work-related

functional restrictions.

Payne performed a variety of activities despite her impairments. She cared for her son and nephew, prepared meals, went shopping, and performed housework. Tr. 143-146. Payne reported that she went outside daily, walked with her son, drove a car, and attended her son's baseball games twice a week for the three month season. Tr. 34 and 147. Payne stated that she is able to pay bills, count change, handle a savings account and use a checkbook and money orders. Tr. 146. Payne spends time with others about 3 times per week. Tr. 147. When given an opportunity to do so, Payne on a "check-box" form did not indicate that her impairments affected her ability to understand, follow instructions, use her hands, get along with others, complete tasks, and see, talk or hear. Tr. 148. Payne admitted that she could lift 10 pounds and walk about ½ mile, sit for 1 hour, stand for 1 hour, and pay attention indefinitely. Id. Payne stated that she was "great" at following both written and oral instructions. Id.

## DISCUSSION

The administrative law judge at step one of the sequential evaluation process found that Payne has not engaged in substantial gainful work activity since February 5, 2007, the alleged disability onset date. Tr. 13. He further stated in relevant part as follows:

> [A]t the hearing in this matter [Payne] admitted that [] she has received, and is receiving, unemployment compensation. In order to be awarded unemployment benefits, the application requires the claimant to attest to and certify that she is ready, willing, and able to work and is currently looking for work in order to qualify. While receipt of unemployment compensation is not an automatic bar to disability benefits, the certification as to ability to work is a strong consideration when assessing a claimant's credibility. The claimant's attestation to the unemployment agency that she is ready, willing, and able to work and is currently looking for work is incongruous with her position herein, i.e., that she is disable and unable to work. By asserting both that she [] is ready, willing, and able to work and that she is severely disabled as a result

of her medical impairments and therefore unable to work, the claimant has brought the credibility of her own statements into question. Clearly, only one of these contradictory assertions can be true and the undersigned finds that the totality of the evidence indicates that the claimant is ready, willing and able to work.

Id.

At step two of the sequential evaluation process, the administrative law judge found that Payne had the following severe impairments: "degenerative disc disease and migraine headaches." Id. The administrative law judge stated that these impairments were severe because they had "more than a minimal impact on [Payne's] ability to perform some work-related activities" but that they were "not completely disabling." Tr. 14.

At step three of the sequential evaluation process the administrative law judge found that Payne's impairments did not individually or in combination meet or equal a listed impairment. Tr. 14.

At step four of the sequential evaluation process the administrative law judge found that Payne could not perform her past relevant skilled, sedentary to medium work but that she had the residual functional capacity to perform a limited range of unskilled, sedentary work. Id. Specifically, the administrative law judge found that Payne could perform unskilled, sedentary work which involved lifting and carrying 10 pounds occasionally, sitting for up to 6 hours in an 8-hour workday, standing and walking for up to 2 hours in an 8-hour workday with the option to change positions every 20 minutes and which involved performing simple, repetitive work. Id.

In concluding that Payne had the residual functional capacity to engage in a limited range of unskilled, sedentary work, the administrative law judge considered the several functional evaluations which indicated that Payne could perform light to medium work

but gave Payne the benefit of the doubt and reduced her residual functional capacity to the unskilled, sedentary level. He also noted that no treating physician opined that Payne was totally disabled. Tr. 16-17.

At step five, the administrative law judge based on a residual functional capacity of a limited range of unskilled, sedentary work as described above and the testimony of a vocational expert found that Payne had the ability to perform work as a sorter, telephone receptionist, and an assembler of small products, and that there were a significant number of such jobs in the regional economy. Tr. 18.

The administrative record in this case is 333 pages in length and we have thoroughly reviewed that record. The administrative law judge did an adequate job of reviewing Payne's vocational history and medical records in his decision. Tr. 11-19. Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 15, Brief of Defendant.

Payne argues that the administrative law judge erred when (1) he stated that none of Payne's treating physicians indicated she was a surgical candidate, and (2) he found that Payne's testimony was not credible. We find no merit in Payne's arguments.

The Social Security regulations require that an applicant for disability benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. § 404.1512(c). Payne failed to provide such evidence. No physician or other medical provider who treated Payne indicated that Payne

was disabled for the requisite 12 month period required by the statute[29] and no treating physician provided a statement of Payne's work-related functional abilities which would prevent her from engaging in the limited range of unskilled, sedentary work set by the administrative law judge.  In fact, Dr. Miric, one of Payne's treating physicians, completed a functional assessment that is supportive of the ALJ's decision.  Dr. Miric, as noted earlier in this memorandum, indicated that Payne could sit and walk  for 2 to 5 hours (for each activity) during an 8-hour workday, stand for 4 to 5 hours, and that she could lift and carry 10 pounds.

Although the ALJ did indicate that "none of the claimant's physicians has opined that she is a surgical candidate," we consider this harmless error, if in fact it was error.[30]  We are not convinced that this statement by the ALJ even if erroneous warrants a remand of the case to the Commissioner for further proceedings.

Payne must demonstrate that an alleged error caused her harm.  See Shinseki v. Sanders, 556 U.S. 396,___, 129 S.Ct. 1696, 1706 (2009)("The burden of showing that an [alleged] error is harmful normally falls upon the party attacking the agency's determination."); Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir 1989)(noting that "no principle of administrative law or common sense requires [a court] to remand a case in quest

---

[29]As stated earlier in this memorandum to receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

[30]As mentioned earlier in this order, Dr. Artamonov, a treating physician, indicated that surgery would only be considered after Payne underwent an unsuccessful radiofrequency ablation of the bilateral dorsal root ganglion.

of a perfect opinion unless there is reason to believe that the remand might lead to a different result"); see also Weary v. Astrue, Civil No. 10-896, slip op. at 40-41 (M.D.Pa. Dec. 15, 2010)(Muir, J.)(applying harmless error analysis); Boyd v. Astrue, Civil No. 11-600, slip op. at 25-26 & 28 (M.D. Pa. May 10, 2012)(Munley, J.)(same).

The administrative law judge found that Payne suffered from two medically determinable severe physical conditions, i.e., degenerative disc disease and migraine headaches. The administrative law judge, however, stated that Payne's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of unskilled, sedentary work. Tr. 15. The administrative law judge was not required to accept Payne's subjective claims regarding her physical limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed Payne when she testified at the hearing on March 23, 2010, the administrative law judge is the one best suited to assess the credibility of Payne.

Payne fails to explain how remand would change the outcome of the case.

Notably, Payne admitted that she wanted "to hold off" on surgery and that medications sufficiently controlled her symptoms. Tr. 331. The argument that the ALJ's credibility determination is defective because of his alleged erroneous statement regarding surgery does not stand up under close scrutiny. The ALJ's based his credibility judgment on several factors, including Payne's benign examination findings, the medical opinion evidence, Payne's admitted response to conservative treatment, and the inconsistency in Payne's claim of disability while simultaneously collecting unemployment compensation benefits. Tr. 13-17. The ALJ did except some of Payne's subjective complaints of pain and in fact acknowledged that pain by reducing Payne's residual functional capacity to the sedentary level. Under the circumstances of this case a remand for further proceedings is not warranted.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


s/A. Richard Caputo
A. RICHARD CAPUTO
United States District Judge


Dated: November 1, 2012